IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:24CR 92 |
| v. | 18 U.S.C. § 1341<br>Mail Fraud<br>(Count 1) |
| ADAM LAMAR HARRELL, | |
| *Defendant.* | 18 U.S.C. § 666(a)(1)(A)<br>Federal Program Theft<br>(Count 2) |
| | 26 U.S.C. § 7201<br>Evasion of Tax Assessment<br>(Count 3) |
| | Forfeiture Allegation |



## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

At all times relevant and material to this Criminal Information:

1. The defendant, ADAM LAMAR HARRELL (hereafter, "HARRELL"), resided in Midlothian, within the Eastern District of Virginia.

A. **Virginia Department of Health**

2. The Virginia Department of Health ("VDH") is an organization and agency of the Commonwealth of Virginia, with the mission to protect the health and promote the well-being of all people in Virginia.

3. The Virginia Office of Emergency Medical Services ("OEMS") is a programmatic office and component of VDH. OEMS is located in the Eastern District of Virginia. OEMS is

1

tasked with planning and coordinating an effective and efficient statewide emergency medical services system.

4. HARRELL was an employee of VDH from on or about August 10, 2013, and continuing intermittently through on or about August 18, 2023. During his tenure at VDH, HARRELL held multiple positions within the agency. On or about September 10, 2019, HARRELL became the Associate Director of OEMS. As Associate Director of OEMS, HARRELL was responsible for managing Virginia's emergency response programs, epidemiology research, and the information technology systems that Virginia's emergency medical service providers rely on, among other responsibilities.

**B.     Western Virginia EMS Council**

5. The Western Virginia EMS Council ("WVEMS") is one of 11 regional emergency medical services councils in the Commonwealth of Virginia. The councils are responsible for the development and implementation of an emergency medical services delivery system for its respective region.

6. The councils are nonprofit organizations that provide training and coordination services to local emergency medical service providers, and they implement state policy through contracts with the Commonwealth's OEMS.

7. The councils also serve as pass-throughs for OEMS payments to vendors. In general, under this pass-through arrangement, the council enters into a contract with a vendor, but the council makes contract payments at the direction of OEMS and from an account funded by OEMS.

8. Under this pass-through arrangement, OEMS's vendors would occasionally send invoices directly to WVEMS for payment, and a representative of WVEMS would obtain approval

for that invoice from an employee of OEMS. In other instances, an employee of OEMS – including HARRELL – would send the vendor invoice directly to WVEMS and give WVEMS authorization to pay the invoice with OEMS's funds. Invoices sent directly to WVEMS did not have to go through OEMS's normal accounts payable process, and such invoices were subject to little or no oversight by OEMS's Accounts Payables Department.

### C. Virginia State Corporation Commission

9. The Virginia State Corporation Commission ("SCC") is a state agency with regulatory authority over business and economic interests in Virginia. Among other functions, the SCC serves as the central registration office for corporations, limited partnerships, and limited liability companies.

### D. Vendor A

10. Vendor A is an office supply company located in the Richmond Metropolitan Area. Vendor A is an approved vendor of VDH and OEMS and has frequently done business with those and other government agencies in the Commonwealth of Virginia.

11. To fulfill purchase orders submitted by clients – including VDH and OEMS – Vendor A occasionally utilizes subcontractors to perform the work or provide the requested services. Those subcontractors, however, are not required to be approved vendors with VDH and OEMS, as Vendor A retains the discretion to utilize non-approved subcontractors to fulfill purchase orders.

### E. Embezzlement Scheme

12. Beginning on or about November 9, 2020, and continuing through on or about August 18, 2023, in the Eastern District of Virginia and elsewhere, the defendant, HARRELL, knowingly devised and intended to devise a scheme and artifice to defraud his employer, OEMS,

3

and to obtain money and property from the same, by means of materially false and fraudulent pretenses, representations, and promises.

### *Purpose and Object of the Scheme*

13. The primary purpose and object of HARRELL's scheme was to unjustly enrich himself by misappropriating money from OEMS through various means.

### *Manner and Means of the Scheme*

14. The various ways and means through which HARRELL sought to accomplish the purpose of his scheme to defraud included, but were not limited to, the following.

15. HARRELL, on or about November 9, 2020, registered a Virginia limited liability company, Strategic Tech Innovations, LLC ("Strategic Tech"), with the SCC in order to embezzle funds belonging to his employer, OEMS. HARRELL listed himself as the organizer and registered agent in the Articles of Organization for Strategic Tech, and HARRELL utilized his residential address in Midlothian as Strategic Tech's registered office address and principal office address.

16. On or about November 9, 2020, HARRELL opened a business checking account for Strategic Tech at SunTrust Banks, Inc. (hereafter, the "Strategic Tech Checking Account"), listing himself on the bank paperwork as the Chief Executive Officer for Strategic Tech. At the time, HARRELL was the sole signatory on the account.

17. On or about November 12, 2020 – days after registering Strategic Tech with the SCC – HARRELL proposed to Vendor A that it use Strategic Tech as a subcontractor for certain services and/or items to be provided to and paid for by OEMS. In truth, as HARRELL well knew, OEMS did not actually need and had not directed HARRELL to request any of these proposed services and items.

18. HARRELL, when proposing Strategic Tech as a subcontractor to Vendor A, knowingly and deliberately concealed from Vendor A his ownership of and affiliation with Strategic Tech. Likewise, HARRELL knowingly and deliberately concealed from his employer, OEMS, that he had proposed that Vendor A use Strategic Tech, HARRELL's company, as a subcontractor for an OEMS-funded project. By doing so, HARRELL ensured that neither Vendor A nor OEMS were aware that HARRELL had a conflict of interest and had proposed a transaction that financially benefited himself.

19. On or about November 12, 2020, HARRELL, ostensibly acting in his capacity as OEMS's Assistant Director, forwarded an e-mail and estimate purportedly created by a Strategic Tech employee to an OEMS Employee (hereafter, "OEMS Employee 1"). The estimate was in the approximate amount of $193,076, for software and/or technology to be provided to OEMS by Strategic Tech. HARRELL directed OEMS Employee 1 to contact Vendor A and ask what Vendor A's markup would be on the Strategic Tech estimate. OEMS Employee 1 complied with HARRELL's instruction and contacted R.L., an employee of Vendor A.

20. On or about November 12, 2020, R.L. responded to OEMS Employee 1 that Vendor A would bill OEMS $229,852.38 for utilizing Strategic Tech as a subcontractor to provide the requested services. Shortly after providing Vendor A's pricing, R.L. e-mailed OEMS Employee 1 again and requested a telephone number for Strategic Tech. In the email, R.L. informed OEMS Employee 1 that R.L. could not find anything on the internet with the name and address listed on Strategic Tech's estimate.

21. On or about November 12, 2020, OEMS Employee 1 forwarded R.L.'s email to HARRELL, stating "Please respond to [R.L.]." That same day, HARRELL responded to OEMS Employee 1's e-mail, writing, "I will reach out to [Strategic Tech]. I know they are a newer

company. Been around about a year." In truth and fact, as HARRELL then and there knew, this was a false statement, as HARRELL had only created Strategic Tech days before. Further, HARRELL continued to conceal from OEMS Employee 1 (and Vendor A) HARRELL's ownership of and affiliation with Strategic Tech.

22. On or about November 12, 2020, HARRELL provided R.L. with a phone number purportedly associated with Strategic Tech, when, in fact, the phone number was a Google Voice number that HARRELL had obtained that same day. At no time, however, did R.L. speak to any representative of Strategic Tech over the phone; instead, on or about November 15, 2020, R.L. began receiving e-mails from "Robert Green," a purported employee of Strategic Tech. No such person existed, however, as "Robert Green" was a fictitious person and alias created by HARRELL to further the scheme and artifice to defraud and to conceal HARRELL's ownership of and affiliation with Strategic Tech.

23. Ultimately, on or about November 15, 2020, Vendor A agreed to provide OEMS with the requested services and/or technology, and retained Strategic Tech as a subcontractor to fulfill the OEMS purchase order (that, unbeknownst to both OEMS and Vendor A, was an unauthorized creation of OEMS's Assistant Director, HARRELL). As part of this arrangement, on or about November 23, 2020, a representative of Vendor A delivered to HARRELL (as OEMS's representative) a check for Strategic Tech in the approximate amount of $193,076, which Vendor A understood that HARRELL would provide to Strategic Tech. Utilizing his familiarity with and influence over OEMS's invoicing and funding processes, HARRELL subsequently ensured that OEMS reimbursed Vendor A for the cost of Vendor A's invoice—that is, $229,852.38.

24. On or about November 23, 2020, HARRELL deposited the $193,076 check into the Strategic Tech Checking Account and used those funds for his own personal expenses.

6

Unbeknownst to OEMS and Vendor A, HARRELL set exorbitant and non-market prices for the various line items on the invoice.

25. Beginning on or about January 1, 2021, and continuing through on or about May 23, 2023, HARRELL created 15 fraudulent invoices for services and technology that Strategic Tech would purportedly provide to OEMS. HARRELL knew when drafting these invoices that his alter ego company, Strategic Tech, would not actually be providing the vast majority of the proposed goods or services to OEMS. When drafting these invoices, HARRELL set exorbitant and non-market prices for the various line items on the invoice.

26. HARRELL would subsequently submit these fraudulent invoices to WVEMS (via e-mail) without OEMS's knowledge or approval. Each of these invoices were paid by WVEMS with funds belonging to OEMS.

27. By directing the invoices to WVEMS instead of Accounts Payable at OEMS, HARRELL deliberately and knowingly (a) circumvented the requirement that Strategic Tech be approved as a vendor to VDH and OEMS, and (b) evaded any scrutiny by OEMS's Accounts Payable department. HARRELL, by dint of his role as OEMS Associate Director, was able to unilaterally approve the same fraudulent Strategic Tech invoices that he had personally drafted.

28. HARRELL directed WVEMS to mail the payments for these Strategic Tech invoices (that is, checks made out to Strategic Tech) to Strategic Tech's purported address. To facilitate and expedite these mailings, HARRELL typically provided WVEMS with prepaid shipping labels that HARRELL had purchased, which directed the mailings to either HARRELL's personal residence or (on occasion) a UPS Store mailbox rented by HARRELL. WVEMS was unaware that—when complying with HARRELL's instructions on where to mail Strategic Tech's

payments—WVEMS was in actuality mailing these payment checks directly to HARRELL's personal residence or HARRELL's rented UPS Store mailbox.

29. For instance, on or about January 19, 2021, HARRELL e-mailed to a representative of WVEMS a false and misleading Strategic Tech invoice in the approximate amount of $831,309.99 for services and technology that Strategic Tech had purportedly provided to OEMS. In truth and fact, as HARRELL then and there knew, none of these services had been provided or would be provided to OEMS. Along with this invoice, HARRELL also e-mailed a prepaid FedEx shipping label to facilitate and expedite the mailing of a check from WVEMS to Strategic Tech's address – that is, HARRELL's home address in Midlothian, Virginia, within the Eastern District of Virginia – as payment for Strategic Tech's work.

30. On or about January 21, 2021, utilizing the prepaid FedEx shipping label HARRELL provided, a representative of WVEMS submitted to FedEx mail matter containing a check to Strategic Tech in the approximate amount of $831,309.99 to be delivered to Strategic Tech's purported address in Midlothian, Virginia. On or about January 22, 2021, HARRELL received this check in the mail and deposited the check into the Strategic Tech Checking Account. He then used the funds to pay his personal expenses.

31. HARRELL took cautionary measures to obfuscate and conceal his affiliation and ownership of Strategic Tech in order to prevent the detection of his scheme. For instance, on or about January 8, 2021, HARRELL filed paperwork with the SCC that listed "Robert Green," a fictitious person and alias created by HARRELL, as the registered agent of Strategic Tech. On the paperwork, HARRELL falsely listed "Robert Green" as Strategic Tech's Office Manager. Thereafter, on or about March 17, 2021, HARRELL filed paperwork with the SCC to change Strategic Tech's principal address from HARRELL's home address in the Eastern District of

Virginia to "Robert Green's" purported address, which was, as previously noted, the address of a mailbox located at a UPS Store in the Eastern District of Virginia.

32. HARRELL also took measures to conceal his self-dealing and conflicted transactions from OEMS. On an annual basis, HARRELL, as an employee of the Commonwealth of Virginia, was required to submit conflict of interest disclosure statements to the Virginia Conflict of Interest and Ethics Advisory Council, which, in turn, would make such disclosures publicly available on the Council's website. HARRELL electronically signed the forms he submitted, affirming that the information he provided on the forms was full, true, and correct. Beginning in 2021 and continuing through 2023, HARRELL routinely provided false and misleading information on these forms.

33. Specifically, despite Strategic Tech receiving hundreds of thousands of dollars from OEMS due to the false and misleading invoices HARRELL submitted to WVEMS, HARRELL denied (a) receiving remuneration, benefits, or compensation for service as an officer or director of a business; (b) owning a business that has a value in excess of $5,000 or having an interest in a business with a value in excess of $5,000; (c) representing any business before any state governmental agency during the specified calendar year for which he received compensation in excess of $5,000 for such representation; and (d) furnishing services to any business operating in Virginia during the specified calendar year for which compensation was received in excess of $5,000 for such services.

34. HARRELL deposited each of the checks he received from WVEMS as a result of HARRELL's fraudulent Strategic Tech invoices into the Strategic Tech Checking Account and subsequently used those OEMS funds for his personal expenses, to include the purchase of real estate properties, luxury vehicles, dozens of firearms, and jewelry. In total, through his

9

submission of false and misleading Strategic Tech invoices to WVEMS, HARRELL received approximately $4,144,319 in funds belonging to OEMS to which he was not entitled.

### F. HARRELL's Evasion of Federal Income Tax Assessment

35. The Internal Revenue Service ("IRS") is an agency within the Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting taxes owed to the Treasury of the United States by its citizens.

36. On or about March 9, 2021, HARRELL filed or caused to be filed a joint federal income tax return with his spouse for tax year 2020. On the IRS Form Schedule C, Profit or Loss from Business, HARRELL reported being the sole proprietor of Strategic Tech. On this form, HARRELL reported receiving $193,076 in gross receipts for Strategic Tech, an amount which corresponds to the payment Strategic Tech received from Vendor A in November of 2020, but also reported expenses for Strategic Tech in the approximate amount of $200,340, for a net loss of $7,264. By reporting expenses for his fictitious, alter ego business, HARRELL fraudulently lowered his taxable income, which generated a refund of approximately $934 when in reality he owed additional taxes to the IRS.

37. HARRELL thereafter ceased reporting any income from Strategic Tech on the federal income tax returns he filed for tax years 2021, 2022, and 2023, despite being aware of the legal requirement that he truthfully report all income to the IRS on his tax returns.

38. For instance, on or about April 20, 2022, HARRELL electronically filed and caused to be filed a joint federal income tax return with his spouse for tax year 2021. On this return, HARRELL listed his and his spouse's total income as $140,671, which income consisted of HARRELL's OEMS salary and his spouse's salary. Despite receiving approximately $2,082,819 in payments from OEMS as a result of his fraudulent Strategic Tech invoicing scheme, HARRELL

knowingly and deliberately did not report any income from Strategic Tech. HARRELL's failure to report this additional income resulted in HARRELL receiving a tax refund of approximately $17,513, when a truthful accounting of HARRELL's total income for tax year 2021 would have required HARRELL to pay additional taxes to the IRS in the approximate amount of $972,852.55. When he filed this return, HARRELL knowingly falsely declared, under penalty of perjury, that the return was true, accurate, and complete.

39. Beginning in or about November 2020 and continuing through March 2024, in the Eastern District of Virginia and elsewhere, HARRELL did willfully attempt to evade and defeat assessment of federal income tax due and owing by him in the United States of America for the tax years 2021, 2022, and 2023, in the amount of approximately $1,880,287.34.

### *Affirmative Acts of Income Tax Evasion*

40. From in or about November 2020, until at least in or about March 2024, in the Eastern District of Virginia and elsewhere, HARRELL did willfully attempt to evade and defeat the assessment of substantial individual income taxes due and owing by him to the United States for the calendar years 2021, 2022, and 2023, by completing, among others, the following affirmative acts of evasion: (a) the filing of false federal income tax returns for tax years 2021, 2022, and 2023 that omitted income HARRELL received from Strategic Tech; (b) using a nominee entity, Strategic Tech, to disguise from the IRS and others the nature and receipt of income; and (c) the filing of false and misleading conflict of disclosure forms with the Virginia Conflict of Interest and Ethics Advisory Council in 2021, 2022, and 2023 that failed to disclose HARRELL's compensation from and ownership of Strategic Tech.

## COUNT ONE
(Mail Fraud)

41. The allegations contained in paragraphs 1 through 34 of this Criminal Information are realleged and incorporated as if fully set forth herein.

42. From in or about November 9, 2020, and continuing through on or about August 18, 2023, in the Eastern District of Virginia and elsewhere, for purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, the defendant, ADAM LAMAR HARRELL, knowingly caused to be delivered by mail, or by any private or commercial interstate carrier, according to the direction thereon, the following mail matter:

| Count | Date of Mailing (on or about) | Description of Mailing |
|---|---|---|
| 1 | January 21, 2021 | A mailing containing a check to Strategic Tech in the approximate amount of $831,309.99 that was mailed by a representative of WVEMS, who submitted that mailing to FedEx, a commercial interstate carrier, on or about January 21, 2021, in order for FedEx to deliver the mailing to Strategic Tech's designated and purported address in Midlothian, Virginia, in the Eastern District of Virginia. |

(In violation of Title 18, United States Code, Section 1341).

## COUNT TWO
(Federal Program Theft)

43.  The allegations contained in paragraphs 1 through 34 of this Criminal Information are realleged and incorporated as if fully set forth herein.

44.  VDH received during the one-year periods beginning on 08/01/2019, 08/01/2020, 08/01/2021, 08/01/2022, and ending on 07/31/2020, 07/31/2021, 07/31/2022, and 07/31/2023, respectively, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance.

45.  During his employment with VDH, HARRELL was an agent of VDH for purposes of 18 U.S.C. § 666(d)(1), and VDH was a government agency of the Commonwealth of Virginia, as that term is defined at 18 U.S.C. § 666(d)(2).

46.  From in or about November 9, 2020 and continuing through on or about August 18, 2023, in the Eastern District of Virginia and elsewhere, the defendant, ADAM LAMAR HARRELL, being an agent of VDH, an agency of the Commonwealth of Virginia, did knowingly and intentionally embezzle, steal, obtain by fraud, and otherwise without authority knowingly convert to the use of the defendant, a person other than the rightful owner, as part of a continuing course of conduct and scheme, property valued at least $5,000 or more that was under the care, custody, and control of VDH and the government of the Commonwealth of Virginia, namely, HARRELL intentionally embezzled funds belonging to VDH and OEMS by submitting approximately 15 false and misleading Strategic Tech invoices to WVEMS and obtaining approximately $4,144,319.00 in funds belonging to OEMS.

(In violation of Title 18, United States Code, Section 666(a)(1)(A)).

## **COUNT THREE**
(Evasion of Tax Assessment)

47. The allegations contained in the Introductory Allegations and Section F of this Criminal Information are realleged and incorporated as if fully set forth herein.

48. From in or about November 2020, until at least in or about May 2024, in the Eastern District of Virginia and elsewhere, ADAM LAMAR HARRELL, a resident of Midlothian, Virginia, did willfully attempt to evade and defeat the assessment of substantial individual income taxes due and owing by him to the United States for the calendar years 2021, 2022, and 2023, by, among others, the following affirmative acts of evasion: (a) the filing of false federal income tax returns for tax years 2021, 2022, and 2023 that omitted income from Strategic Tech; (b) using a nominee entity, Strategic Tech, to disguise from the IRS and others the nature and receipt of income; and (c) the filing of false and misleading conflict of disclosure forms with the Virginia Conflict of Interest and Ethics Advisory Council in 2021, 2022, and 2023 that failed to disclose HARRELL's compensation from and ownership of Strategic Tech.

(In violation of Title 26, United States Code, Section 7201).

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2 (a) of the Federal Rules of Criminal Procedure, the defendant is hereby notified that if convicted of the offense charged in Count One of this Criminal Information, he shall forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

The defendant is further notified that if convicted of the offense charged in Count Two of this Criminal Information, he shall forfeit any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such violation.

The property subject to forfeiture includes but is not limited to:

A sum of money of at least $4,337,395, which represents the total proceeds of the offenses charged, which shall be reduced to a monetary judgment against the defendant in favor of the United States.

If any property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c); Title 18, United States Code, Section 982(a)(3); and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date:  June 24, 2024          By:  _____
                                   Thomas A. Garnett
                                   Kashan K. Pathan
                                   Assistant United States Attorneys